IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

CHARLES W. FULLER,                    )
                                      )
            Plaintiff,                )          8:07CV125
                                      )
       v.                             )
                                      )
SOCIAL SECURITY                       )          MEMORANDUM AND ORDER
ADMINISTRATION, MICHAEL J.            )
ASTRUE, Commissioner,                 )
                                      )
            Defendant.                )
_____


     Pursuant to the parties' consent, this case is pending
before me for final disposition.[1]  The plaintiff, Charles W.
Fuller ("Fuller") has appealed the decision of the defendant, the
Commissioner of the Social Security Administration
("Commissioner"), to discontinue his Title II and Title XVI
social security benefits.  After carefully reviewing the record,
I find that the Commissioner's decision should be reversed.


I.  PROCEDURAL BACKGROUND


     Fuller applied for Title II and Title XVI social security
disability benefits on April 17, 1991, alleging he became
disabled and unable to work effective January 4, 1990 due to
neurological and musculoskeletal impairments.  AR 37.  The
plaintiff had sustained injury to his left radial nerve after
being stabbed in the arm.  AR 37-38.  The plaintiff also had
varicose veins in his right lower extremity, and underwent
ligation and stripping of these veins in March 1991.  As a result

_____

     [1]See filing 9, "Consent to Exercise of Jurisdiction by a
United States Magistrate Judge," and 28 U.S.C. § 636(c).

of these conditions, the plaintiff had an "almost dysfunctional left upper extremity and paresthesias throughout his right leg." AR 39.  As of the time of his social security hearing in 1991, the plaintiff was found incapable of performing work requiring moderate to heavy lifting/carrying, bilateral manual dexterity and/or fine hand manipulations, excessive walking, and prolonged standing and/or climbing.  AR 39.  The plaintiff was unable to return to his past relevant work as a security guard, and although he was able to perform entry-level and unskilled sedentary occupations on a part-time basis, an administrative law judge ("ALJ") found he was not able to perform substantial and gainful work activity within the meaning of the social security regulations.  The ALJ concluded the plaintiff was disabled and entitled to social security benefits effective January 4, 1990. AR 41.

Pursuant to social security regulations, (20 C.F.R. §§ 404.1594(a), 416.994(a)), the plaintiff's file was reviewed and investigated in 1996 and 2000 to determine if his disability continued and if he remained eligible for social security benefits.  On both occasions, the SSA concluded that the plaintiff was still unable to engage in substantial gainful employment.  He continued receiving social security benefits.  AR 51-79.

The SSA again evaluated the plaintiff in 2004 to determine his continued entitlement to social security benefits.  Upon review of the 2004 medical records from the Creighton University Medical Center and Radhika Madhu, M.D., a consulting physician, the SSA concluded the plaintiff was no longer disabled as of September 1, 2004, and that social security disability payments would cease as of November 30, 2004.  AR 89.

2

The plaintiff filed a request for reconsideration.  The hearing officer rendered a decision on March 24, 2005 which denied the plaintiff's request for reconsideration and affirmed the cessation of his benefits.  AR 108-113.

The plaintiff appealed this ruling on March 28, 2005 and requested a hearing before an ALJ.  AR 126-134.  The hearing was initially scheduled for November 17, 2005, and the plaintiff appeared at this hearing without representation.  AR 326, 403. Upon questioning by the ALJ, the plaintiff stated he wanted counsel.  The hearing was recessed to permit the plaintiff to retain counsel.  AR 407-08.

The plaintiff retained counsel, and on December 23, 2005, his attorney requested a vocational assessment and a repeat consultative medical examination of the plaintiff, citing alleged deficiencies in the report and testing of Dr. Madhu.  AR 333-34. This request was denied.

The evidentiary hearing before the ALJ was held on April 13, 2006.  The plaintiff appeared with counsel and testified at the hearing.  Dewey K. Ziegler, M.D., a neurologist, and vocational expert Gail Leonhardt also testified at the hearing.  AR 353, 359 & 410.  The ALJ's adverse decision was issued on June 30, 2006, (AR 9-19), and Fuller's request for review by the Appeals Council was denied on February 10, 2007.  AR 4-6.  Fuller's pending complaint requesting judicial review and reversal of the Commissioner's decision was timely filed on April 4, 2007. Filing 1 (Complaint).

3

II.   THE ALJ'S DECISION.

The ALJ evaluated Fuller's claims under the eight-step
evaluation process for cessation of Title II benefits, and the
seven-step process for cessation of Title XVI benefits. 20 C.F.R.
404.1594 and 416.994.  See also Nelson v. Sullivan, 946 F.2d 1314
(8th Cir. 1991).  The ALJ found:

1.   The most recent favorable medical decision finding that
     the claimant continued to be disabled is the
     determination dated January 19, 2000.  This is known as
     the "comparison point decision" or CPD.

2.   At the time of the CPD, the claimant had the following
     medically determinable impairments:  nerve damage in
     the left arm and varicose veins.  These impairments
     were found to result in the residual functional
     capacity to perform unskilled and entry-level sedentary
     work on no more than a part-time basis.

3.   Through September 1, 2004, the date the claimant's
     disability ended, the claimant did not engage in
     substantial gainful activity (20 CFR 404.1594(f)(1)).

4.   The medical evidence establishes that the claimant did
     not develop any additional impairments after the CPD
     through September 1, 2004.  Thus, the claimant
     continued to have the same impairments that he had at
     the time of the CPD.

5.   As of September 1,2004, the claimant did not have an
     impairment or combination of impairments which met or
     medically equaled the severity of an impairment listed
     in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
     404.1525, 404.1526, 416.925 and 416.926).

6.   Medical improvement occurred as of September 1, 2004
     (20 CFR 404.1594(b)(1) and 416.994(b)(1)(i).

7.   . . . [A]s of September 1, 2004, the claimant had the
     residual functional capacity to perform the basic
     requirements of sedentary work as defined in the
     regulations.  Such work should:  allow for an option to
     sit/stand and elevate the feet 3 to 4 inches; avoid

4

more than periodic pushing/pulling with the left arm; avoid more than periodic pushing/pulling with the lower extremities; avoid crawling; avoid more than occasional stooping, squatting, kneeling, or climbing ladders or ropes; avoid the use of air vibrating tools; avoid the use of motor vehicles; avoid more than periodic work around moving machinery; avoid more than periodic work around unprotected heights; avoid more than periodic exposure to dust, smoke, or feelings; and avoid more than periodic exposure to temperature extremes of cold and heat or humidity.

8.  The claimant's medical improvement is related to the ability to work because it resulted in an increase in the claimant's residual functional capacity (20 CFR 404.1594(c)(3)(ii) and 416.994(b)(2)(iv)(B)).

9.  As of September 1, 2004, the claimant's impairments were severe (20 CFR 404.1594(1)(6) and 416.994(b)(5)(v)).

10.  The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

11.  On September 1,2004, the claimant is a younger individual 45-49 (20 CFR 404.1563 and 416.963).

12.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

13.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

14.  As of September 1, 2004, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was able to perform a significant number of jobs in the national economy (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

15.  The claimant's disability ended as of September 1, 2004 (20 CFR 404.1594(f)(8) and 416.994(b)(5)(vii)).

AR 9-19.

5

III.   ISSUES RAISED FOR JUDICIAL REVIEW.

Fuller's complaint requests judicial review of the ALJ's adverse ruling.  He raises the following arguments in support of his claim for reversal:

- The ALJ erred when he denied plaintiff's request for a more detailed medical examination of his left dominant arm and hand, and as a result, failed to adequately develop the record with respect to plaintiff's ability to grip, grasp, handle, finger, and feel.

- The ALJ erred in relying upon testimony from the vocational expert that plaintiff could perform work in three job categories, all classified as light in the Dictionary of Occupational Titles ("DOT"), when the ALJ found that plaintiff's residual functional capacity ("RFC") limited him to less than a full range of unskilled sedentary jobs.

- The ALJ erred in failing to properly evaluate plaintiff's pain when making an assessment of his RFC.

- The ALJ did not evaluate all of the medical opinions in the record and relied upon less than substantial evidence to support findings regarding medical improvement and RFC in that he: 1) erroneously used January 19, 2000 as a "comparison point decision;" 2) assessed the plaintiff's impairments caused by only the nerve damage in his left arm and his varicose veins; 3) failed to consider problems that arose after January 19, 2000, including hypertension and the June 2005

6

exacerbation of his left arm injury due to a car accident; and 4) failed to afford proper weight to the opinion of the plaintiff's chiropractor.

Filing 14 (Claimant's brief).

In response, the Commissioner argues the ALJ was not required to order an additional medical examination because the medical records presented were sufficient to determine whether Fuller was disabled; the vocational expert's testimony did not conflict with, but rather appropriately expanded on the standardized job descriptions contained in the DOT; the ALJ committed no reversible error when he disregarded a chiropractic opinion of functional capacity in favor of a physician's opinion; and although there were  misstatements in the opinion, the ALJ's decision is well supported by the opinions of two acceptable medical sources, Dr. Zeigler and Dr. Madhu, and any writing deficiencies were immaterial and cannot provide a basis for setting aside the decision.  Filing 17 (Commissioner's brief).


IV.   THE RECORD AND PROCEEDINGS BEFORE THE ALJ.

At the time of her hearing, Fuller was forty-six years old and had not worked for over fifteen years.  He had an eleventh grade education and was able to read, write, and speak English.

When the plaintiff was medically evaluated in 1999, Dr. Schwid noted that the plaintiff had atrophy of the left arm, decreased sensitivity to pinprick in the left hand, decreased "repetity of repetitive motions" in the left hand compared to the right, and decreased grip strength in the left hand, with seven

7

pounds per square inch of grip strength in the left hand compared
to 19 pounds per square inch in the right hand.  The doctor noted
that the plaintiff had mildly prominent superficial veins in the
lower limbs, and although the plaintiff complained of
intermittent swelling of the right ankle after standing for
thirty minutes, there was no major edema in the right ankle at
the time of examination.  Dr. Schwid concluded that "this
gentleman has posttraumatic sensory and motor function and
reduction in the left upper limb and particularly the left hand,"
"posttraumatic intermittent stasis edema of the right ankle," and
he is "status post right leg varicose vein stripping with no
complications."  AR 145-148.

In accordance with the periodic review requirements of 20
C.F.R. §§ 404.1594(a) and 416.994(a)), the plaintiff completed
SSA Daily Activities and Symptoms interrogatories on May 26,
2004.  According to the interrogatory responses, the plaintiff
was living with his sister at that time, but was able to take
care of his day-to-day personal needs and handle his own money.
AR 83.  He reportedly did not drive, stayed home a lot, watched a
lot of television, used Extra Strength Tylenol for pain, and due
to his medication, slept 4 hours at a time on and off throughout
the night.  AR 84.  The plaintiff was reportedly able to do his
own dishes and laundry, but did not help with outside household
chores and sat most of the day due to pain in his leg.  AR 83.
The plaintiff further stated he can walk only 2 to 3 blocks,
climb only 8 to 10 steps, stand for only 30 to 45 minutes before
he needs to rest due to pain in his ankle, and sit for only 2 to
3 hours without having to move; and his legs, ankle, and arms
hurt just about every day, with his pain reaching 6 to 7 on a
scale of 10, and the pain lasting 3 to 4 hours at a time.
Movement makes the pain worse; pain medication makes the pain

subside in about 40 minutes, but this medicine makes him sleepy
and the pain returns in 4 hours.  AR 86.  The plaintiff stated
his medication was Extra Strength Tylenol, "not very good but
it['s] all [I] have."  AR 86.  The plaintiff reported that his
sister helped him complete the interrogatories because "it hurts
to write this much."  AR 87.

The plaintiff was evaluated by Dr. Madju on August 30, 2004.
AR 228-236.  The plaintiff complained of pain at the scar area of
his left hand, numbness extending from his left elbow to his
fingers, pain in his right ankle, pain in his calves due to
varicose veins, and diminished grip strength.  The plaintiff
stated he was unable to write.  AR 228.  The plaintiff reported
that he takes a pain medication, possible Darvocet, every four to
six hours as needed for pain.  He reported that he occasionally
drinks beer, smokes six cigarettes a day, and drinks four cans of
pop a day.  AR 229.

On examination, Dr. Madhu noted the plaintiff had alcohol on
his breath.  The appointment occurred in the morning.  AR 484-85.
The plaintiff was in a good mental state and communicated
effectively.  The doctor further noted that the plaintiff was
able to sit continuously for 25 minutes, did not use any
assistive devices to stand, get on and off the examination table,
sit down, or stand up.  His gait was normal and there was no
evidence of limping.  AR 231.  His pulses were +4/+4 and
symmetrical in upper and lower extremities, motor strength was
5/5 in all extremities, and his reflexes were 2+ in both the
upper and lower extremities.  The plaintiff's grip strength was
slightly less on the left than on the right.  Dr. Madhu found:

> At this time, there is no evidence of weakness in his
> left hand.  He had good range of motion.  There was no

9

scar tenderness.  The plaintiff had no problem with
sitting, standing, but had however, alcoholic breath.
His blood pressure was noted to be elevated.  The
claimant had no trouble walking.

AR 233-34.

On September 29, 2004, the SSA sent a "Notice of Disability
Cessation" to the plaintiff.  AR 89.  The notice explained that
although the plaintiff stated he was still unable to use his left
arm and had ankle pain, based on the plaintiff's current medical
records, the plaintiff had no left arm atrophy or ankle problems,
and had full range of motion in the left hand and normal
coordination in both hands.  The SSA concluded, "The findings
show that medical improvement has taken place in your left arm
and hand, and your overall condition does not keep you from doing
work activity."  AR 90.

The plaintiff completed a request for reconsideration of his
cessation of disability benefits on October 4, 2004.  He went to
the SSA interview by himself and completed the forms requesting
reconsideration without assistance.  The SSA interviewer noted
"no problems filling out forms himself.  No disability noticed in
arms or legs–no difficulty walking."  AR 99.  The plaintiff is
left-handed.  AR 110.

A Physical Residual Functional Capacity Assessment was
performed on December 2, 2004.  The examiner found no exertional,
postural, manipulative, visual, communicative, or environmental
limitations.  AR 162-166.  The examiner noted "disproportionate
complaints of limitations not supported by objective medical
findings . . . Severity of symptoms, complaints, Not credible."
AR 167.  The examiner further commented:

10

> Presently there was no atrophy noted of upper left
> extremity.
>
> Presently there was gross intact sensory of left hand.
>
> Presently coordination was noted as fine in both hands
> [with] full ROM.
>
> Presently pulses are 4+
>
> Medical improvement has occurred.
>
> No significant limitations noted.

AR 169.

The plaintiff was seen at the Creighton University Medical
Center on February 9, 2005 for complaints of right dorsal hand
pain and swelling and right leg pain.  AR 239-40.  The medical
record noted questionable mild redness of the right dorsal hand.
AR 239.  An x-ray of plaintiff's right hand was negative.  AR
242.

The hearing on plaintiff's request for reconsideration was
held before a SSA disability hearing officer on March 3, 2005.
The officer noted:

> Clmt walked with a limp and held on to the table to
> help support himself when standing.  Had brace on left
> hand.  Said he had crutches in car.  Didn't provide
> much detail when asked questions-diff to get
> information.

AR 123.  The plaintiff testified that he had no difficulty
writing, but could sit for only 30 minutes at a time, could walk
only one block, and could stand for only 10-15 minutes.  The
plaintiff had not been injured between the time he completed the
May 26, 2004 interrogatories and the time of his March 2005
hearing.  The plaintiff testified he had arthritis in both wrists

11

and must wear braces.  Although he had the braces with him at the
hearing, he did not wear them.  AR 151.  The plaintiff stated the
arthritis was diagnosed in x-rays taken in February 2005, but the
x-ray taken was negative.  See AR 242.  There was no
documentation supporting plaintiff's claim that a doctor
recommended wrist braces.  AR 151.

The SSA hearing officer reviewed the plaintiff's Creighton
University Medical Center records from December 13, 1991 through
February 9, 2005, and further compared the 1999 medical report of
Dr. Schwid, (AR 145-150), to the 2004 medical report of Dr.
Madju, (AR 228-236).  AR 109, 125.  On March 24, 2005, the
hearing officer issued a decision finding the plaintiff was not
entitled to continued disability benefits.  The decision
explained:

> Current medical evidence was obtained from a
> consultative examination with Dr. R. Madhu on 8/30/04.
> . . .  His blood pressure was 190/80.  His pulses were
> +4/+4.  He had varicose veins in both legs.  There was
> no tenderness reported in his calves.  His sensory exam
> was intact.  Motor strength was 5/5 in all extremities
> although his grip strength was said to be diminished on
> the left compared to the right.  There was no atrophy
> present.  Coordination was fine in both hands.
> Reflexes were 2+ in all extremities.  He had full range
> of motion in his left hand.  Records were also obtained
> from Creighton University where he was last seen on
> 2/9/05.  He was seen with complaint of right hand
> tenderness and leg pain.  Physical examination revealed
> questionable "mild redness" in his hand but was
> otherwise within normal limits.  His knee joint had
> full range of motion.  His gait was said to be steady.
> There was no calf tenderness or evidence of deep vein
> thrombosis.  X-rays of the right wrist were negative.
>
> A review of the overall evidence establishes that Mr.
> Fuller has a history of treatment for deep vein
> thrombosis, nerve injury to his left arm, hypertension
> and ankle surgery.  Mr. Fuller's testimony regarding

12

the intensity and functionally limiting effects of his
impairment were [sic] not consistent with the overall
evidence and are [sic] not considered credible.  The
medical evidence indicates that Mr. Fuller retains the
capacity to perform a full range of work activities.

AR 111.  The hearing officer found the plaintiff's medical
condition had improved since his last disability review in 2000,
and currently "the medical evidence does not establish that Mr.
Fuller has a medically determinable impairment that has more than
a minimal effect on his ability to do basic work activities."  AR
113.  The hearing officer held the plaintiff was "Not Disabled."
AR 113.  The plaintiff appealed this ruling on March 28, 2005.
AR 126-134.

The plaintiff was involved in an automobile accident on June
23, 2005, and sought chiropractic treatment on June 29, 2005.  AR
307.  The plaintiff was a front seat passenger at the time of the
collision and reportedly braced his arms against dashboard when
the collision occurred.  He complained of left arm, elbow and
wrist pain, and central to lower back pain.  AR 308.  Although a
letter from the chiropractor, Shawn Schmidt, D.C., states he
treated the plaintiff until March 3, 2006, no chiropractic
treatment was provided between October 19, 2005 and March 3,
2006.  AR 394.

Dr. Schmidt's ongoing treatment of the plaintiff was focused
on his spine and, to some degree, his left ankle.  AR 303-306,
394.  Dr. Schmidt wrote a letter and completed a patient
evaluation form on April 11, 2006 which outlined Dr. Schmidt's
assessment of the plaintiff's impairments, including any
impairments to the plaintiff's left hand and arm.  AR 390-93.
The plaintiff's hearing before the ALJ convened on April 13,
2006.  At the outset of the hearing, the entirety of Dr.

13

Schmidt's letter and evaluation form were read to Dr. Ziegler, a
consulting physician who participated in the hearing by
telephone.  AR 421-425.

    According to Dr. Schmidt's records, the plaintiff's grip
strength was measured on March 3, 2006 with a dynamometer.  The
results indicated a marked reduction in strength on the left,
with the right side measuring 26 pounds and left side measuring
6.07 pounds.  Dr. Schmidt's patient evaluation form stated the
plaintiff experiences pain, but does not have paresthesias,
abnormal gait, postural hypotension, weakness, sensory loss,
decreased deep tendon reflexes, chronic fatigue, cramping,
burning calves and feet, or muscle atrophy.  AR 391, ¶ 4.  The
plaintiff's pain was reportedly in the area from his left elbow
to his left hand, was characterized as moderate, and varied from
day to day.  Dr. Schmidt anticipated that the plaintiff's pain
would frequently interfere with the his ability to focus and
perform even simple work tasks, and the plaintiff would likely
miss 3 work days per month.  AR 392-93.  The chiropractor noted
that this impairment had not lasted and was not expected to last
12 months.  AR 391.

    Dr. Schmidt identified no limitations with respect to the
distance the plaintiff can walk without pain.  He concluded the
plaintiff could stay seated and could stand for no longer than
two hours at a time, but he could sit or stand for 6 of the 8
hours in a working day without needing to walk around.  According
to Dr. Schmidt, the plaintiff would need unscheduled breaks every
1 to 2 hours, each break lasting fifteen minutes.  According to
Dr. Schmidt, the legs did not need to be elevated during
prolonged sitting.

Regarding the left forearm, Dr. Schmidt concluded the plaintiff could never lift 20 or more pounds, and could rarely lift up to 10 pounds.  Apparently contradicting paragraph 4 of the evaluation form, (AR 391, ¶ 4), Dr. Schmidt explained that the plaintiff has significant limitations with reaching, handling, or fingering, and has pain, muscle weakness, motor loss, sensory loss/numbness and limited motion in his left upper extremity.  He concluded the plaintiff can use his left hand, fingers and arms only 10% of an 8-hour workday.  AR 392.

Regarding the plaintiff's lumbar spine, Dr. Schmidt stated the plaintiff can occasionally (6% to 33% of an 8-hour workday) twist, stoop, crouch, or squat.  AR 392.

The plaintiff's complaints and symptoms were submitted as evidence at the administrative hearing by offer of proof and through the plaintiff's testimony.  Based on these evidentiary sources, the plaintiff claimed he had a permanent loss of sensation below the elbow on the left upper extremity, consistent pain in his left arm and tingling in his left fingers, low back pain, headaches, varicose veins in his lower extremities, hypertension, and left ankle swelling related to screws that were surgically placed in that joint in 1990.  AR 433.

The plaintiff claimed he can stand for only 10 minutes.  He claimed he can walk only a block, and when it rains, he can barely walk at all.  The plaintiff's leg pain and swelling was reportedly equal on both sides, and occurred almost daily.  AR 438.  The pain was described as an 8 on a scale of 1 to 10.  AR 437, 475.

15

The plaintiff testified that he can sit for only 30 minutes at a time, and must elevate his feet for a couple of hours a day and wear compression hose for his varicose veins.  A vein had "popped" and was bleeding at the time of the hearing, but this was an unusual occurrence.  AR 436, 471, 472.  The plaintiff claimed his leg problems had gotten worse over the last two months, but he later claimed the problems began when he started seeing the chiropractor in June of 2005.  AR 473, 476.  He had not seen a doctor since February 9, 2005, and explained that he did not seek medical help for the varicose veins due to financial concerns.  However, he could not name the doctors who were unwilling to provide care.  AR 473, 477-78.

The plaintiff testified that he rarely drinks, (AR 478), but then admitted that he drinks three cans of beer a day.  AR 479.  He claimed he started drinking a year before the hearing.  AR 479.  However, medical records from a November 2003 stabbing incident indicate he admitted to drinking a six-pack of beer and was told at that time to stop drinking.  AR 480-81.  The plaintiff has not explained his alcohol consumption to his doctors, but his doctors have told him not to drink while using his pain medication.  AR 482-83.  The plaintiff takes Naprosyn every 4 to 6 hours nearly every day, which reportedly causes itchy skin, drowsiness, and dizziness.  The plaintiff testified that Naprosyn alone makes him dizzy, but when combined with alcohol, he is even dizzier.  The plaintiff naps 3-4 hours a day. AR 436-38, 483.

Dr. Ziegler, a neurologist and professor at the University of Kansas Medical School Department of Neurology, listened to the plaintiff's testimony and offer of proof, and to the recitation of Dr. Schmidt's April 11, 2006 opinions.  The doctor had also

16

reviewed the plaintiff's medical records.  The doctor concluded
that the information available was sufficient to form opinions
concerning the plaintiff's medical conditions.  He stated he did
not need additional evidence.  AR 440-442.  The doctor outlined
the plaintiff's conditions as follows:

> The claimant has residuals of . . . radial nerve injury
> to the left arm with subsequent decrease in strength in
> the grip of the left hand and impaired sensation in the
> left forearm with parenthesis with the numbness and
> tingling can be interpreted as pain.  He has apparently
> had an occasion of . . . stasis edema in the . . .
> right leg after . . . after it [was] held in the
> dependent position for a while.   He's had varicose
> vein stripping. . . .  He's had hypertension and has a
> history of back and neck pain of a . . . more
> non-specific nature.

AR 442-43.


     As to the left hand, the only neurological deficit
identified was decreased sensation in the dorsum (back) of the
left hand.  Dr. Ziegler testified that this neurological injury
should not limit plaintiff's hand function other than, perhaps,
some fine movements.  AR 444, 448-49.  Although the plaintiff
testified that he had numbness in his thumb, forefinger, and
middle finger on the hand, and in the upper part of his forearm,
the doctor testified that these symptoms were not anatomically
consistent with a radial nerve injury.  AR 449.  As to the loss
of grip strength, Dr. Ziegler noted the discrepancy between Dr.
Madhu's findings and Dr. Schmidt's, but he further explained that
the accuracy of a dynamometer measurement is always subject to
the individual's effort, (AR 448), and contrary to Dr. Schmidt's
report, any limitations would be to the left hand, not the left
arm.  AR 451.

17

As to the plaintiff's left upper extremity, Dr. Ziegler testified that there was no medical evidence limiting the plaintiff's ability to reach either to the front, the side, below the head, or below the shoulders.  AR 455.  However, he explained that the plaintiff's ability to handle, finger, and feel with the left hand was markedly limited.  The medical record provided no basis for determining what precise left hand movements were limited; only total grip strength had been measured, and based on Dr. Schmidt's testing, that was only one-third of normal.  AR 456.  Due to the decreased hand strength, Dr. Ziegler opined that the plaintiff could not hold more than five pounds with his hand in a palm upright position.  AR 456.

Dr. Ziegler concluded the plaintiff can lift or carry five pounds frequently and ten pounds occasionally (AR 453); stand and walk cumulatively two hours out of an eight-hour workday (AR 454); and stand and walk for more than 30 minutes without needing to rest (AR 454).  There was no evidence supporting any limitations on the plaintiff's ability to reach above the head or shoulders, to the front or to the side, or to bend, twist, or turn, crawl, stoop, squat, kneel, or climb, (AR 455, 457), and no medical evidence supporting any limitation on sitting; specifically, there was nothing of record to support plaintiff's claim that he could not sit 6 hours out of an 8-hour work day or for more than 45 minutes at a time, or that he needed to shift positions while seated.  AR 452, 454, 466.  As to the plaintiff's right upper extremity, Dr. Ziegler testified that there was no medical evidence supporting any limitation on plaintiff's ability to grip, grasp, hold, move his fingers, or feel.  AR 455.  Dr. Ziegler testified that there was no medical evidence, either before 2000 or at the time of the hearing, supporting any finding of impairments or limitations due to the plaintiff's

18

varicose veins.  AR 445-46.  The doctor found no medical records justifying the plaintiff's claim that he experienced leg pain at a level of 8 on a zero to 10 scale.  AR 447.  Dr. Ziegler testified that there were no impairments associated with the plaintiff's hypertension.  AR 450.

The ALJ posed hypothetical questions to the vocational expert.  He asked the expert to assume a left-handed person with an eleventh grade education and a vocational profile identical to the plaintiff's and is capable of performing a full range of sedentary work, but has the following limitations or impairments:

-- He cannot push or pull repetitively with his left arm if any strength is needed, push or pull repetitively with his lower extremities bilaterally, crawl, climb ladders or ropes, work at unprotected heights, work around moving machinery, work in areas of more than moderate concentrations of dust, smoke, or fumes, or work in temperatures extremes of cold, heat, or humidity.

-- He cannot stoop or squat for more than two hours a day; kneel for more than one hour a day; and can only occasionally climb steps and stairs.

-- He must be able to elevate his legs to chair level during normal employer-provided work breaks.

-- As to his left dominant hand, he can perform gripping or grasping movements, flex his wrist, and finger, but he has a significant decease in sensation and he cannot grip more than five pounds with his palm upright.

AR 489-90.  Assuming these restrictions, the vocational expert testified that the plaintiff could work as a Cashier II (DOT 211.462-010), with 20,000 jobs in the regional geographical area; an Office Helper (DOT 239.567-010), with 2,643 jobs in the regional geographical area; or a collator operator (DOT 208.685-010), with 300 jobs in the regional geographical area.

19

AR 491, 492.  The vocational expert testified that these job
options remained available even if the person had to elevate his
feet three to four inches while seated at his work station, and
was unable to use air vibrating tools or motor vehicles.  AR 492.

However, if the person had no ability to grip with the left
dominant hand, needed to rest away from the work station five to
ten minutes every half hour, needed to elevate his feet two
hours, could only stand for ten minutes before needing to sit or
elevate his feet, (AR 493), or if he had the restrictions
outlined by plaintiff's chiropractor, Dr. Schmidt, (AR 495-96),
there would be no jobs existing in significant numbers in the
national economy that the person could perform.


V.   ANALYSIS


Section 205(g) of the Social Security Act, 42 U.S.C. §
405(g), provides for judicial review of a "final decision" of the
Commissioner.  A denial of benefits by the Commissioner is
reviewed to determine whether the denial is supported by
substantial evidence on the record as a whole.  Hogan v. Apfel,
239 F.3d 958, 960 (8th Cir. 2001).


> If substantial evidence on the record as a whole
> supports the Commissioner's decision, it must be
> affirmed.  Choate v. Barnhart, 457 F.3d 865, 869 (8th
> Cir. 2006).  "'Substantial evidence is relevant
> evidence that a reasonable mind would accept as
> adequate to support the Commissioner's conclusion.'"
> Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006)
> (quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir.
> 2000)).  "The ALJ is in the best position to gauge the
> credibility of testimony and is granted deference in
> that regard."  Estes v. Barnhart, 275 F.3d 722, 724
> (8th Cir. 2002).

Schultz v. Astrue, 479 F.3d 979, 982 (8th Cir. 2007).  Evidence
that both supports and detracts from the Commissioner's decision
must be considered, but the decision may not be reversed merely
because substantial evidence supports a contrary outcome.  Id.
See also Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).


   1.   Failing to obtain a more detailed medical examination
        of his left dominant arm and hand.


     The plaintiff argues that a more detailed medical
examination was needed to adequately develop the record with
respect to plaintiff's ability to grip, grasp, handle, finger,
and feel with his left hand.  The court agrees.

     Dr. Ziegler testified that the plaintiff was markedly
limited in his ability to handle, finger, and feel with his left
dominant hand.  He testified that the plaintiff has limitations
with both strength of grip and fine finger movement.  However,
when asked to further describe these limitations, the doctor
stated that the medical record did not include enough details to
fully answer the question.  The doctor could not explain the
plaintiff's left hand impairments, except with respect to
plaintiff's grip strength, the only hand movement tested.  AR
456.  Grip strength and fine finger movement and dexterity are
not the same.

     The degree and precise manner in which the plaintiff's fine
hand movements are limited is an important consideration in this
case.  Based on the evidence of record, only unskilled sedentary
jobs are ostensibly available for the plaintiff in the national
economy.  As noted in Social Security Ruling (SSR) 96-9p, 1996 WL
374185, at *8 (July 2, 1996): "Most unskilled sedentary jobs

21

require good use of both hands and the fingers; i.e., bilateral
manual dexterity.  Fine movements of small objects require use of
the fingers; e.g., to pick or pinch.  Most unskilled sedentary
jobs require good use of the hands and fingers for repetitive
hand-finger actions."

"The Eighth Circuit has consistently held that the ALJ has
the 'duty to develop the record fully and fairly,' even where the
claimant is represented by counsel."  Freeman v. Apfel, 208 F.3d
687, 692 (8th Cir. 2000).  See also Garza v. Barnhart, 397 F.3d
1087, 1089 (8th Cir. 2005); Dozier v. Heckler, 754 F.2d 274, 276
(8th Cir. 1985); Vaughn v. Heckler, 741 F.2d 177, 179 (8th Cir.
1984).  This includes the duty to develop the record, and if a
physician's report of a claimant's limitations are stated only
generally, the ALJ should ask the physician to clarify and
explain.  See Vaughn, 741 F.2d 177, 179 (8th Cir. 1984).
Moreover, an ALJ is required to order medical examinations and
tests if the medical records presented do not provide sufficient
medical evidence to determine the nature and extent of a
claimant's limitations and impairments.  Barrett v. Shalala,  38
F.3d 1019, 1023 (8th Cir. 1994); 20 C.F.R. § 416.919a(b).

The court will remand this case for further evaluation and
development of the medical record regarding any impairment and
limitation on plaintiff's use of his left hand.

2.   Relying upon testimony from the vocational expert.

The plaintiff argues that the three job categories
identified by the vocational expert, and their descriptions as
set forth in the DOT, are inconsistent with the plaintiff's
residual functional capacity.  As such, the plaintiff claims the

22

ALJ was not allowed to rely on this testimony in finding that the plaintiff can perform these jobs.   The court agrees.

The DOT's definition of an "occupation" is a collective description of numerous jobs, and information "about a particular job's requirements or about occupations not listed in the DOT may be available in other reliable publications, information obtained directly from employers, or from a VE's . . . experience in job placement or career counseling."   SSR 00-4p.   "DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range." Wheeler v. Apfel, 224 F.3d 891, 897 (8th Cir. 2000)(citing Hall v. Chater, 109 F.3d 1255, 1259 (8th Cir. 1997)).   "In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT," (Wheeler, 224 F.3d at 897 (citing Hall v. Chater, 109 F.3d at 1259)), and DOT descriptions "may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities."   Id.

However, "an ALJ cannot rely on expert testimony that conflicts with the job classifications in the DOT unless there is evidence in the record to rebut those classifications. . . .". Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 979 (8th Cir. 2003).   The ALJ's decision must explain how any conflict between the VE's testimony and the DOT job description was resolved.   SSR 00-4p ("Explaining the Resolution").   In resolving the conflict, the ALJ may consider whether the VE possesses information not listed in the DOT about a specific job.   Id.

The ALJ's hypothetical question asked the vocational expert to assume the plaintiff could perform "a full range of sedentary

23

work" subject to the limitations further described in the
question.  In response, the vocational expert testified that the
plaintiff could perform the job of Cashier II (DOT 211.462-010),
Office Helper (DOT 239.567-010), and Collator Operator (DOT
208.685-010).  As to each of these jobs, the DOT describes the
physical requirements as follows:

> STRENGTH:  Light Work - Exerting up to 20 pounds of
> force occasionally (Occasionally: activity or condition
> exists up to 1/3 of the time) and/or up to 10 pounds of
> force frequently (Frequently: activity or condition
> exists from 1/3 to 2/3 of the time) and/or a negligible
> amount of force constantly (Constantly: activity or
> condition exists 2/3 or more of the time) to move
> objects.  Physical demand requirements are in excess of
> those for Sedentary Work.

1991 WL 671840 (211.462-010 Cashier II);  1991 WL 672232
(239.567-010 Office Helper); 1991 WL 671753 (208.685-010 Collator
Operator).  Although the vocational expert may be able to explain
the inconsistency between his testimony and the DOT job
descriptions, he was never asked to provide an explanation.
Neither the record nor the ALJ's decision explain how the
plaintiff, who was found able to perform sedentary work with a
five-pound limitation in palm-upright use of his left hand, could
nonetheless perform jobs classified as "Light Work" requiring the
use of up to 20 pounds of force.

In addition, absent further development of the medical
record, the vocational expert's opinion cannot stand.  "An
accurate accounting of an individual's abilities, limitations,
and restrictions is necessary to determine the extent of erosion
of the occupational base, [and] the types of sedentary
occupations an individual might still be able to do." SSR 96-9p
at *6.

Accordingly, the ALJ's decision is reversed and remanded for further evaluation of the job market available to the plaintiff once the medical record is further developed regarding any limitations on plaintiff's use of his left hand.

3.  <u>Failing to properly evaluate plaintiff's pain</u>.

The plaintiff argues that the ALJ failed to properly consider his complaints of pain.  The ALJ specifically found that "the claimants medically determinable impairments could have reasonably been expected to produce the alleged symptoms," however, "the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible."  AR 15.

To assess a claimant's credibility, the ALJ must consider all of the evidence.  <u>Lowe v. Apfel</u>, 226 F.3d 969, 971-72 (8th Cir. 2000)(citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984).  The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole.  <u>Id</u>. at 972.  The ALJ is not required to discuss methodically each <u>Polaski</u> consideration, so long as the ALJ acknowledges and examines those considerations before discounting the subjective complaints, (<u>id</u>.(citing <u>Brown v. Chater</u>, 87 F.3d 963, 966 (8th Cir. 1996)), and makes "express credibility findings," and "explain[s] the record inconsistencies that support those findings."  <u>Dolph v. Barnhart</u>, 308 F.3d 876, 879 (8th Cir. 2002).

25

The ALJ's decision explicitly outlined numerous facts he considered in concluding Fuller was not entirely credible.  The ALJ noted:

-- Although the plaintiff went to the hospital or clinic fairly regularly, he made some of these visits simply because he had ran out of medication and needed a refill.  AR 16.

-- The plaintiff testified that he had significant and debilitating sensory loss in the left elbow, tingling in the fingers, hand pain and weakness, and pain in both legs, yet during his August 30, 2004 examination by Dr. Madhu, there was no evidence of atrophy or any joint tenderness in the wrist, elbows, shoulders, hips, knees, or ankles.  The plaintiff had full motor strength in all extremities with only a "slight" decrease in the left hand grip strength.  Dr. Madhu observed bilateral varicose veins, but there was there was "no calf tenderness and no edema that would be consistent with a more serious condition."  AR 16.

-- Although the plaintiff testified that he needed to elevate his feet as a result of swelling and had pain at a level of 8 out of 10, he never reported this level of pain to any medical providers.  AR 16.

-- During the plaintiff's testimony, he denied alcohol use in 2004 and denied drinking beer, "but later admitted that he drinks three cans of beer a day and had done so for several years and as far back as 2003."  AR 16.

-- The plaintiff claimed he did not seek out medical care for his increased problems with varicose veins because he had "no money for prescriptions or medical treatment," but the plaintiff could not identify any medical problem for which he was denied treatment or medication due to financial reasons.   AR 16.

-- The plaintiff acknowledged occasionally using marijuana, but claims it was his girlfriend's and not his.  AR 16.

The ALJ's decision specifically describes inconsistencies between Fuller's complaints and the objective medical findings, inconsistencies between the level of pain and discomfort he

reported to doctors and the symptoms he complained of at the hearing, and inconsistencies within his own hearing testimony. This analysis sufficiently explains the ALJ's credibility determination.  Fuller's claim that the ALJ failed to properly assess and credit his subjective complaints of pain must be denied.

> 4.   <u>The ALJ did not evaluate all of the medical opinions in the record and relied upon less than substantial evidence to support his findings regarding medical improvement and RFC</u>.

The plaintiff claims the ALJ did not adequately assess the plaintiff's disabilities because he failed to consider impairments other than those caused by nerve damage in his left arm and bilateral varicose veins, failed to consider those impairments that arose after January 19, 2000 (including plaintiff's hypertension, the June 2005 exacerbation of his left arm injury due to a car accident, and his increased problems with varicose veins), and failed to afford proper weight to the opinion of the plaintiff's chiropractor.

> a.   <u>Weight afforded to chiropractor's decision</u>

The plaintiff's chiropractor, Dr. Schmidt, placed restrictions on the plaintiff that far exceeded those described or discovered by any medical doctor, including restrictions on plaintiff's ability to use his back and legs for such movements as sitting, standing, walking, bending, and stooping.   The ALJ specifically rejected the chiropractor's testimony, instead adopting the opinion of Dr. Ziegler who placed no restrictions on these activities.

A chiropractor is not considered an acceptable source of
medical evidence to prove disability; such evidence may only be
used to show how an impairment affects the claimant's ability to
work.  See <u>Cronkhite v. Sullivan</u>, 935 F.2d 133, 134 (8th Cir.
1991)(citing 20 CFR 404.1513(a) and (e)); <u>Kelley v. Massanari</u>, 18
Fed. Appx. 453, 454, 2001 WL 1040019, *1 (8th Cir. 2001);
<u>Burdette v. Apfel</u>, 2000 WL 1371110, *1 (8th Cir. 2000).   The
court further notes that the chiropractor's disability evaluation
was, in essence, a checklist and the responses were not
internally consistent.  Physical capacity checklists are
typically given little weight because of the interpretive
problems inherent in the use of such forms.  <u>O'Leary v.
Schweiker</u>, 710 F.2d 1334, 1341 (8th Cir. 1983).  See <u>Holmstrom v.
Massanari</u>, 270 F.3d 715, 721 (8th Cir. 2001)(checklist format and
incompleteness of assessments limit their evidentiary value);
<u>Taylor v. Chater</u>, 118 F.3d 1274, 1279 (8th Cir. 1997) (residual
functional capacity checklists are entitled to little weight in
the evaluation of a disability).  Finally, Dr. Schmidt did not
treat the plaintiff for the six-month period prior to issuing his
April 11, 2006 disability opinions, (see AR 394), and the
treatment he did provide was not focused on the primary source of
the plaintiff's problem, the plaintiff's left hand.   The ALJ did
not err in disregarding the disability opinions of Dr. Schmidt.

        b.   <u>Impairment related to hypertension</u>

        Although the plaintiff claims the ALJ failed to consider his
impairment related to hypertension, there was no evidence that
hypertension caused any impairment.  Dr. Ziegler specifically
testified that plaintiff's hypertension caused no impairment that
would affect the plaintiff's ability to work.  The ALJ did not

err in failing to consider hypertension as a source of
disability.

    c.    <u>The June 2005 exacerbation of his left arm injury, or
any increased problems caused by varicose veins</u>

Following his car accident in June 2005, the plaintiff did
not seek treatment from any physician related to the alleged
exacerbation of his left hand injury or his increasing problems
with varicose veins.  Based on a review of the medical records,
the chiropractor he did see following the accident primarily
treated spinal injuries.  As to his varicose vein problems, the
plaintiff's testimony was not consistent concerning when these
problems allegedly started to get worse, and the ALJ did not find
his stated reason for failing to seek treatment from a doctor
credible.  The ALJ did not err in failing to consider any alleged
exacerbations of left arm and varicose vein problems when
determining the plaintiff's type and level of impairment.

Accordingly, except with respect to determining more
specifically what limitations the plaintiff may have regarding
the use of his left hand, the ALJ did not fail to adequately
consider and assess the evidence in determining the nature and
extent of the plaintiff's impairments.

CONCLUSION

The ALJ did not fully develop the record to determine the
extent and nature of the plaintiff's limitations on the use of
his left hand, and relied on vocational expert testimony that was
inconsistent with the DOT without explaining why this testimony
was nonetheless reliable.  On remand, the ALJ should reevaluate

29

and/or clarify Fuller's RFC with respect to his left hand and, assuming testimony is again elicited from a vocational expert, conform any hypothetical questions to the new and/or more specific RFC determination.

   IT THEREFORE HEREBY IS ORDERED:  Judgment shall be entered by separate document providing that the final decision of the Commissioner is reversed and the cause remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

   DATED this 17th day of December, 2007.

                              BY THE COURT:

                              s/ *David L. Piester*

                              David L. Piester
                              United States Magistrate Judge

30